I believe, before we begin, that Judge Moore has a motion. I do. To my colleague's indulgence, I move the admission of Kevin Scott Hardin, who is a member of the bar and good standing of the highest court of the District of Columbia. I have knowledge of his credentials, and I'm satisfied he possesses the necessary qualifications. That's what I have to say. Now, what I'd like to say, Kevin's whole family's here. His mom and dad, Mr. and Mrs. Parton, his brother Patrick and his wife Terry, Chloe, Gray, Ella, and Lydia, they're all here to witness Kevin becoming a member of our bar, which I'm thrilled. Kevin's my law clerk. He's been with me for nearly two years, and he's been an amazing joy to have in my chambers. He's incredibly hardworking and diligent, and I expect he'll bring those same traits to the service of his clients when he appears before our court coming forward. So his parents should be quite proud. They've raised a good lawyer and a good man. Now, I'd like to move for his admission. I suppose we'll grant that. After long and serious consideration, I vote yes. Dan, would you take care of the work here? Please raise your right hand. Do you swear or affirm that you support yourself and the lawyer and counsel of this court outrightly according to law, and that you will support the Constitution of the United States of America? I do. Congratulations, and welcome to the bar of the United States Court of Appeals. Please have a seat. Thank you. Our first case this morning is Phoenix Solution versus West Interactive. Mr. Hadley? Good morning, and may it please the court. I have one point to address on the non-infringement issue and three points to address on the invalidity issue. So let me turn right to the non-infringement issue. Claims 1 and 34 of the 846 patent, the first two limitations of that claim requires an input into a routine that does processing of a speech utterance. That processing produces an output that the claim refers to as a speech utterance signal. The court defined that signal as an analog or digital signal that represents a speech utterance, a perfectly acceptable definition. From there, the second limitation says that you have another routine that takes a speech utterance signal, processes it, and produces something called a representative speech data value. And the court said that the representative speech data value has to be different than the speech utterance signal, which of course it is. That's exactly what the accused West system does, irrespective of what the court decided. Could you hold me just a second, Mr. Hadley? Yes. Have you got the time working? Reggie, thank you. Let's put it at 14 and we'll proceed from there. Excuse me, Mr. Hadley. You may proceed. Thank you, Your Honor. That's exactly what the accused West system does, independent of whether it has voice activity detection, which was the basis upon which the district court sui sponte granted summary judgment of non-infringement. Specifically, what the accused system does  That's the first telephony board that board produces an output, which is an analog signal. That analog signal is fed into a second telephony board, where that board digitizes the signal and packetizes it. And the output meets the ordinary and accepted definition of a representative speech data value. That is all that's required to satisfy the first two limitations of that claim, independent of whether the second telephony board has the voice activity detection or VAD activated or not. That issue does not matter to infringement. So the only issue on non-infringement really becomes whether Phoenix somehow waived its right to argue that the digitizing and packetizing of a speech utterance signal meets the ordinary and accepted definition of a representative speech data value. Isn't a digital signal representing a speech utterance? Of course, a digital signal represents, in some broad sense, a speech utterance. And I recognize that the district court said at JA-15 that a speech data value must be something different than a signal representing a speech utterance. The court never explained what that really meant. And standing alone really doesn't make any sense, because both the speech utterance signal and the representative speech data value, of course, has to represent the original speech that's made into the system. There's no other way that it doesn't. You can't process something even through a two-stage system and have the output still not represent the original input into the first set of processing. I think what the district court really meant to say was that a speech data value must be something different than a speech utterance signal, which the court had said earlier in its opinion. And just misspoke in saying that it has to be something different than a signal representing a speech utterance. If you're going to win on this issue, don't you have to change the claim construction of adapted? No, we don't, Your Honor. The adapted claim construction only matters if, under the argument that a VAD satisfies the meaning of a representative speech data value, because it's undisputed that the output of the second telephony board does packetize and digitize the data. And our contention is that that is all that is needed to create a representative speech data value. Now, really, the only issue then becomes whether that argument was waived when Phoenix moved itself for some re-judgment of infringement, arguing that the VAD satisfies the claim language. It didn't raise the second argument. It moved on the one ground, and the court rejected that argument. But then sua sponte granted some re-judgment of non-infringement. Our contention is that argument was not waived. It was presented in the preliminary infringement contentions. It was raised in the reply brief. And I would just note for the court that the new amendments to Rule 56F states that before summary judgment is granted sua sponte, the court must give notice and provide a reasonable opportunity. Mr. Hadley, why don't you get to the invalidity of three patents? Yes, Your Honor, I have to.  I have three points to raise. It's very narrow points to raise on that issue in my remaining time. The first is that 640 patent claim 35, the 854 patent claim 12, and the 431 patent claims 2 and 10 all require that the claim system be connected to multiple independent databases. And the burden was on West to provide clear and convincing corroborated evidence that Galaxy, the Galaxy system, which is the system that was supposedly in public use that anticipated the claims, was connected in public use to a multi-domain database system. But there is no corroborating evidence to demonstrate that Galaxy was ever actually used by the public as a multi-domain system or in what I would call multi-domain mode. Is it your view that use at MIT with the five four-digit extension, not the full seven-digit telephone number, but the five four-digit extension, is it your view that that does not constitute public use? It is, Your Honor. First, there is no evidence that at MIT it was actually used in that way. In other words, that the researchers at MIT and what one of the articles describes as a testbed for Galaxy ever connected to this Galaxy, and in some places it's described as an architecture, in other places it's described as software. But there's nothing that says in the articles that Mr. Schmatt relies on that the researchers at MIT ever actually connected to Galaxy as a multi-domain system. Now, certainly there are. On page 993 of the appendix, this is the article by, let's see, who is it, Dr. Zhu? Yes. It says, second, talking about Galaxy, second, it is a multi-domain. I mean, I can go on if I need to, but the article certainly characterizes it. The article certainly characterized it as a multi-domain system or architecture software. And the articles clearly say that it was designed to connect to the multiple databases that had existed previously in single domain systems that were in public use. But the articles don't actually say that anybody ever used it in multi-domain mode. Hold on, let's go down to the, I mean, the article says it's multi-domain, and then the article says, at the first sentence of the very next paragraph, the Galaxy architecture has been used extensively in our group as the testbed for developing conversational interface and the underlying human language technology. So they're saying it's a multi-domain system and then saying it has been used extensively in our group. I'm assuming they're talking about the group at MIT. I think that's an assumption, Your Honor. It's certainly talking about the group at MIT, but there's an underlying assumption that it was used in multi-domain mode. And the very next paragraph then talks about its use, and it's limited just to Jupyter. Well, no, but the paragraph about Jupyter actually says quite clearly it's been used, and we've accepted nearly 1,500 calls. So Jupyter is distinct and different from the use of Galaxy, which is discussed in the preceding section, and it's been used extensively in our group. Do you agree that if it was used, if we find that the evidence corroborates the fact that it was used by the MIT group, that then there has been a public use? I don't, because I think it would fall under the experimental use exception to anticipation under 102B. The experimental use exception applies to the inventor and his uses. These are not the inventors. These are not the people who have pursued the patent on this. These are the, quote, prior users coming up with the anticipating use. So why wouldn't their use be a public use? They are someone other than the inventor. There are cases under the public use exception which extend beyond the inventor, I believe. I know they're not in the briefing, but there are situations in which an invention is provided for experimental purposes beyond the inventor by a third party. And as long as, this court, in fact, has said that in Tone Brothers versus Cisco, and this was reiterated by the Supreme Court in Faf versus Wells, that public use is, the public use bar is designed to protect the public's right to retain inventions, quote, that the public has reasonably come to believe are freely available. And in Wells Electronics, the Supreme Court reiterated that the real test is whether the invention is in the public domain. I don't think that the Galaxy system sitting in a test bed at an MIT laboratory, if it was not available for people other than a few researchers to access multiple domains, constitutes a public use. I think that- Well, if one person walks down the street wearing undergarments that no other person can see or has access to, aren't they nonetheless in public use? That's, yes, I think that's correct. And that's a little bit different issue. That goes to what cases sometimes refer to as the secret use issue. But this is really different than secret. This is a test bed. It was used for experimenting. I believe exhibit B- What were they experimenting on? Because it seems to me they were experimenting not on the invention, but rather on the natural, or fixing the natural language algorithm. I think what they were really doing was trying to figure out how this architecture could connect to multiple databases. And they were building- What in the article suggests that? Because I don't see anything in the article that suggests that their use was for that purpose. Because in exhibit B, for example, when it talks about all the calls that you referenced coming in, that was just to the Jupiter system. And what they were doing was trying to build databases of words that the speech recognizer and the natural language processor could recognize and process. And so they collected a whole bunch of calls into the weather system. There's no doubt about that. And that was the single domain Jupiter system. And at the time people called into Jupiter, it may very well have been connected to other databases, but users were never able to access the other databases. But that has nothing to do with my question because that's the Jupiter system. Correct. And everyone agrees the Jupiter system is a single domain system. What I'm trying to ask you about is the Galaxy system, which says it's multi-domain, and it also says it was used extensively at MIT. So I'm trying to understand why that wouldn't constitute a public use. Again, I think that it's not a public use because it was not freely available to the public. There's no evidence that people outside this small group of researchers called in. But these small group of researchers are the public. That's the part you're not appreciating. This isn't the inventor. The small group of researchers are the public. They are not the inventor. I agree with that. Are they not the public? What else are you going to call them? I think that aside from whether I don't believe that this is the kind of use that falls within. Yes or no, do they constitute the public? I believe that they do not constitute the public for purposes of the public use exception under 102B. Why not? The public, they weren't the right number of people. They weren't men and women. They weren't, what reason? Because they didn't place the invention in the public domain. They were experimenting with it. They are the public. They were using it by virtue of being the public. It's in the public domain. But go ahead and please continue. We've reached an impasse, so go ahead. Thank you. The last two issues that I'd like to just quickly raise is the... Is SLS at MIT the inventor of Galaxy? It looks like they came up with the Galaxy idea. The last two points I'd like to just quickly raise is first, there's no evidence in the record that support that the limited grammar was downloaded for context, and that's a requirement of Claims 1 and 9 of the 431 patent. The West relies on the Schmack Declaration in paragraph 23. He provides no cooperating support for that in that paragraph, and in fact, if I could refer the court to the Galaxy article, which was Exhibit C to that declaration, the Galaxy article says at JA1001 that the speech recognizer used a set of content-independent models, which means that there was no limited grammar downloaded for use by the speech recognizer. It also says that the grammar for Galaxy was constructed by combining the existing grammars for Pegasy and Voyager and augmenting them with a new set of rules specific to the weather domain. Again, no limited set of grammar. The district court relied on the natural language processor, which is TINA, but that is different than what the claim requires, which refers to the speech recognizer. And then the court really kind of got caught up in the definition, and the parties did, of the meaning of when in those claims. I think when you look carefully at that claim language, the definition of when really becomes irrelevant because when is referring to not when the grammar is downloaded, but rather when the user is speaking. But regardless, there is no corroborating evidence of downloading the limited grammar. Can I ask you one broader question, which is, for example, if I look at claim one of the 854 patent, and you can pick any of the claims that issue, but if I choose that one, it says providing a database of query-answer pairs concerning one or more topics. Why in the world are you both insisting that this is multi-domain? And I feel like you're both on the same page with this. I may be wrong, but since it says one or more, it seems to me the claim encompasses single-domain, which would have meant that the Jupyter system would have anticipated. So I don't understand why there seems to be a collective agreement that this claim scope extends exclusively to multi-domain. Did you disavow single-domain somewhere? I'm not sure, but I know that multi-domain, for example, is picked up in claim 12. Right, but you agree claim one says one or more, which would certainly include single-domain, which would mean a single-domain reference and use would anticipate. I agree with that. OK. I'm out of time. Thank you, Mr. Hadley. Yes. We'll restore your two minutes. Give Mr. Lemley an additional two minutes if he needs to use it. Mr. Lemley? Thank you, Your Honor. May it please the Court. Mark Lemley on behalf of West Interactive. Let me begin by noting there are a number of interesting arguments raised in this appellant's argument. None of them were raised in the district court, whether the question is, is it an experimental use exception, whether the question is not whether when means before, but a different claim limitation, or whether it is initial digitalization in the infringement analysis. Let me start with the infringement question. The Phoenix tries to avoid the district court's holding. Can I just ask before you go to that, was it likewise not raised whether or not the claims, for example, claim 1 of 854, can be anticipated by a single domain reference? Your Honor, you're right that that was not, in fact, litigated below. And the reason for that is that there were a number of other claims in the patents and dependent claims which did have a multi-domain limitation. So for simplicity, we moved not on all the grounds we could have that would have knocked out some of the claims, but only for the ones that would have knocked out all claims that were asserted. Can we look at the public use? Mr. Schmantt testified that the Galaxy system was capable of being used by the public, but he didn't know that it ever was. Well, Your Honor, actually, I think there are several answers to that question. The first is that Mr. Schmantt himself testified as a precipient witness that he had used the system. And he is a member of the public. He is not a member of the SLS group. Second, as Judge Moore suggested, the MIT group itself, I think, constitutes a public use. There is no evidence in the record suggesting MIT's work was kept as a trade secret or otherwise withdrawn from the public. And this court's precedents, as well as the Supreme Court's, make it- Is there any corroboration, just for starters, for his own use of the system? For his own use, Your Honor, the answer is no. But there is ample corroboration of the availability of the system to the public. Availability? Is there any corroboration of the actual use? Yes, Your Honor. What's that? I'm not sure how you pronounce it. The paper at JA 992 to 993, there was discussion of the system that was presently connected to many real online databases, was extensible to new domains, and in the phone implementation had received over 1,500 calls. Well, Mr. Lumley, that's the Jupiter system. That is the Jupiter component of the galaxy system, Your Honor. That's correct. Jupiter single domain. Jupiter is one domain that is tied, as of 1997, to the galaxy system using the same architecture. But you rely solely on Jupiter in your brief, right? No, Your Honor. We rely on a number of different systems. The Voyager system, for example, which is also part of galaxy and which itself has three different domains in it, maps, travel, and weather. And the Godot 1994 paper shows that that was already implemented in all three domains as of 1994. Initial implementation of galaxy in the travel domain, Godot said, has been completed. That's joint appendix at 1002. The paper porting the galaxy system to Mandarin Chinese, also a 1994 paper, showed that, quote, galaxy has three subdomains in its knowledge base, unquote. The user can freely move from one domain to another in the course of a single conversation, unquote. And galaxy interfaces with the user through a client window and a telephone. Now, I suggest that all of that suggests that as of 1994, well before the critical date, this system was up and running. It had multiple domains. It was capable. No, Your Honor. It was actually in use. It was in use at MIT. One element of the system had received over 1,500 phone calls. But the Xu paper also suggested you could reach that system anywhere in the world via browser and telephone. Now, I think you can couple that with Mr. Schmantz' percipient witness testimony and suggest that there's ample corroboration for his statement that he called into the system and used it before the critical date. But I also think it's not necessary, both for the reason that Judge Moore suggests, the use at MIT is itself a public use, and because the only evidence suggests that this was a system available to the public, that people were calling into the system. There is no evidence submitted at all by Phoenix to contradict any of the pieces of the galaxy system. Looking at page 30 of your red brief, I see only a citation to Jupiter as your evidence of corroboration. Am I wrong? Yes, Your Honor. I believe you are wrong. There's a number of other. You need to find a more diplomatic way to say that, Mr. Schmantz. Yeah. Looking at page 30, we say, Galaxy's public use is amply documented. We cite the Jouet paper, JA993. We cite the real-time paper, which was admittedly three weeks after the critical date, but wasn't indicative that something new had just happened in three weeks, much less that it had happened and suddenly gotten an academic journal article published in that three-week period. It was talking about a system that was already present. And the only evidence, the only documentation, I think, suggests this was a real system in existence, in use. By 1994, a paper was titled Porting the Galaxy System to Mandarin Chinese. The idea that we've not even finished the system beyond the level of experimentation, we're not using it, but we're nonetheless going to port it over into an entirely different language three years, four years before the critical date, I think, is wildly implausible. But even if you're right, ultimately, weren't there genuine issues of material fact here? These were invalidated on summary judgment. No, Your Honor, for the very simple reason that Phoenix never introduced any evidence to contradict ours, and it never even argued, with the exception of the very existence of the galaxy system, that there was a single element lacking in the prior art galaxy system. So there is no factual dispute here, because there's no fact presented by Phoenix to contradict the evidence that we have provided. All they do is ask questions. Maybe you should have gotten a better expert witness closer to the system. Why didn't you hire Mr. Zhu? Well, this was a long time ago. Maybe your memory has faded. We suggest that, as this court has held, asking questions is not enough to contradict evidence. Did the galaxy system in 1994 meet all the limitations of this claim? Your Honor, I believe that it did. And certainly, Phoenix has not argued or pointed to any limitation it didn't meet. Dr. Schmadt, in his role as expert witness, walked through the documentation and explained how the documents together showed that the system had all of the elements. And as of 1994, we do know it was multi-domain, because the porting the galaxy system to Mandarin Chinese paper said, quote, the user can freely move from one domain to another in the course of a single conversation. Where do we find in the record the evidence that it met every limitation in 1994? Well, Your Honor, I think the answer to that is you have to walk through the Schmadt declaration. The reason the Schmadt declaration is there is not because of his prescindent testimony, which is what a lot of Phoenix's briefing focuses on. It's there, too, because none of the papers itself independently lists out in neat form all of the elements of the patent claim. So Dr. Schmadt has to walk through those papers and explain how they have each and every element. But what's notable here is that Phoenix, both in opposing summary judgment and on appeal, does not point to a single element that it says was lacking. The only thing it points to is the claim that the galaxy multi-domain system didn't exist at all in multi-domain format. And the documentary evidence is crystal clear, whether it's Chouet's paper saying it was a distributed multi-domain system. Will you give me just one place in the deposition where Mr. Schmadt says all the limitations are met? Certainly, Your Honor. The Schmadt declaration is at JA 965. The particular identifications of those are in paragraphs 12 through 43. If I might turn to the non-infringement issue, if we're all right. Which was sua sponte? Well, not exactly, Your Honor. Judge Felzer did refer to it as sua sponte. But in fact, we moved, cross-moved for summary judgment. That is joint appendix at 2957 and also 2976 to 77. So in our opposition, we said, now that we know what the disputes are, we think it's clear that summary judgment for us is appropriate. We briefed that issue specifically. Under Ninth Circuit law, that is a perfectly proper procedure. The only question is, does Phoenix have an opportunity to respond? Now, in this case, Phoenix not only had an opportunity to respond on reply brief, make what arguments it wanted, it actually went out and hired a new expert to contradict its own expert because it didn't like its own expert's admissions, put that expert in on a reply brief. It had ample opportunity to litigate this infringement issue. Notwithstanding that, Phoenix is bound by its infringement contentions, not just by what it says in its opening brief where it was moving for summary judgment, but by what it said in its infringement contentions. And it did not argue in its infringement contentions the non-infringement argument it is making right now about initial digitalization. Accordingly, I think under this court's precedence, that argument is waived. In any event, even if it weren't waived, it's wrong. The district court construed the term speech utterance signals to mean, quote, a digital or analog signal representing a speech utterance. Phoenix didn't object to this construction. It doesn't challenge it on appeal. But since a speech utterance signal can be digital under this definition, the mere act of converting the user's voice to a digital signal as the initial step in any kind of coding you would have to do doesn't stop it from being a speech utterance signal. So Phoenix is now reduced to arguing that representative speech data values, which are supposed to be generated from the speech utterance signal, are the very same thing as the speech utterance signal itself. That argument makes no sense, as the district court recognized. And it would vitiate the representative speech data values limitation, something this court has repeatedly said you can't do. Finally, let me say a little bit about the question in the 431 patent of whether the term when means before. It doesn't. The term, whether you look at this court's prior language interpreting the plain meaning of the term when, whether you look at common sense, whether you look at the dictionaries, or whether you look at the claim itself and the specification, all of them suggest when means something different. So consider, for example, the claim language itself, which requires that a speech recognition grammar be loaded for a context experienced by said speaker when said speech based query is made, said context being determined automatically by an application program executing for said speaker at a time when said speaker provides  The way this system works is you have you call in, you start talking. As it figures out what you're talking about, do you want an airline reservation, do you want a weather report, et cetera, it then loads in real time the relevant domain so that it doesn't have to figure out all of the possible words you could be talking about, but only a subset. The only way that can happen is if the loading is dynamic, is if it occurs in real time as I know what the user is talking about. And indeed, not only the language of claim one, but the specification itself specifically calls that out. The specification talks about dynamically loading the grammar for decoding during process of the user speech utterance. Dynamic would have no meaning if everything were preloaded, as Phoenix now requires. And you wouldn't be able to switch between the topics, quote, during an interactive process, as the specification also requires. You're saying that the during of the specification confirms the court's claim construction. Absolutely. As I think does common sense, if I ask you to pass the salt when you're done with it, I don't mean, as Phoenix now suggests, pass the salt before you're done with it, but at no time after. When doesn't mean before, and it certainly doesn't mean only before, and not at the same time as. This court's opinion in Renishaw, which interpreted the common ordinary meaning of the term when, there was no specialized meaning there, considered whether it meant right at the same time as or on or after the date. Before wasn't even a possibility. The claim says the engine uses a grammar of words when the query is made. That almost suggests simultaneously. On the other hand, it suggests having been done before the query was made. If that were all there were, Your Honor, I could see two alternative interpretations of that term. But the second phrase, I think, in the claim, said context being determined automatically by an application program executing for said speaker at a time when said speaker provides said speech-based query, I think has to be simultaneous. It wouldn't be executing at a time when said speaker provides said speech-based query if it had already executed and run before the speaker ever called. How about the use of the verb is? That suggests, that supports your view, I guess. So I think, again, Your Honor, I think that's right. The first use of the term is and when, if it were just that phrase and the second phrase were not present, would be susceptible of that interpretation. We think that interpretation would still be wrong because it's inconsistent with how the system actually works. The system works to allow you to move between domains precisely because it listens to your call and decides on the basis of the words you're using whether or not you want to talk about travel or weather or maps. So it has to be processing dynamically during the call, not before. But just those words standing alone, I agree, could be susceptible of different interpretations. The claim language as a whole, though, clearly requires that the system be executing at the time the speaker is making the call. And that's what the district court held, and we think that's correct. Mr. Lumley, if you don't mind, I'd like to take you back to the validity issue. I think the hardest point that I see for you on validity is in the Schmantt deposition at page 2573, where he's asked the question, and do you know whether in 1997 people actually called in to the galaxy system? Now, certainly his expert report makes it seem like he knows it was in use. But the question is, do you know whether in 1997 people actually called in? And he says, I think that's what I just said. I don't know for a fact that people actually called in. I know the system was capable of it, and anyone with a telephone could reach it. And then he goes on to say, you have to understand, they wanted people to call in. But the problem is, whether he's a fact or whether he's an expert, he's saying the system's capable of working, but he's not sure anyone actually used it. Well, Your Honor, I think that's my point. That's my biggest concern. And just so you know, the mic really picks you up, so it makes it seem like you're yelling at me. Sorry. I've never been accused of being too quiet. Your Honor, first off, I think he indicates that he used the system. So he knows that at least one person has used it. Second, what he's saying in deposition, I think, is quite reasonable, which is he has no personal knowledge of other people calling into the system. But the evidence in the documentary record suggests people did call into the system. The system, as he suggests in this deposition testimony, was open to the public and people were encouraged to call into the system. Now, I think it doesn't matter, Your Honor, as you suggested, whether or not people called into the system. It is absolutely clear in this court's case law that it's not an experimental use if you are not the inventor. And so your own public use at MIT. Hold on. But it does matter if someone called in, right? Because otherwise the system's not used. Well, no, Your Honor. Sitting a car on the road is different from driving the car. So sitting it on the road but not turning it on or starting the engine, you haven't used it. So that's right, Your Honor. But it's clear that the folks at MIT were using it. They were testing it. The only way the system could have been trained was to have people have actual conversations with it. So at a minimum, it was used within MIT.  No, Your Honor, because this court's precedents are crystal clear that third parties' experimental use does not benefit a patentee to delay the public use filing date. Now, I unfortunately don't. One other point, Mr. Lemley. You were saying that in 1994 this already had all the limitations. But when I looked at that paragraph 12 you gave me, Mr. Schmantz said by 1997 they had it operating. What's the right timing here? So, Your Honor, the answer is we don't know for sure. There are a number of papers in 1994 that identify various aspects of the system as a multi-domain system which people could switch between. That is the only element that Phoenix charges. Does this raise a question, though, as to whether you have any actual evidence of public use other than the Jupiter? Well, no, Your Honor. I think the evidence suggests Galaxy has been operating since the early 1990s. And you give us two kind of references. You give us Jupiter. We all agree that's not multi-domain. You give us this 1994 reference. And unfortunately, that doesn't seem there's no evidence that has all the limitations. Well, Your Honor, so first let me first disagree that we all agree that Jupiter is a single domain system. Jupiter was developed before the full multi-domain Galaxy architecture. It was in use. But by 1997, it was a part of the Galaxy system overall. So I think the evidence from Jupiter is itself sufficient to show 1,500 people called into a multi-domain system. I think the evidence also suggests the system was in widespread use within MIT, that it had been developed. It wasn't an experiment. The testimony that Judge Moore points to suggests MIT encouraged people to call in and use it. Is there a sort of snapshot of use? Here's how many people we have used the system. No, unfortunately, we don't have that. But the relevant question, I think, Your Honor, in this case Does that hurt you on summary judgment? No, Your Honor, because the question is, how extensive is the corroboration of this evidence? The only evidence in the record is evidence that suggests the system did exist. It was in operation. It was not secret. And people were using it. There is no contradiction to that evidence. All there are are questions. Thank you, Mr. Lemley. Thank you, Your Honor. Mr. Hadley, the MIT people are the inventors of Galaxy, but they're not you. Does the experimental use apply? I believe it does, Your Honor. I believe there are cases that say that the experimental use exception does apply. I agree the cases are vague on this point, but there are cases that suggest that the experimental use exception applies. Give me the case. Mr. Lemley says it's crystal clear the other way. I don't have a case to cite, but even if there isn't a case, I think the court should use this opportunity to address the issue. Was that raised below? It was not specifically raised below in terms of the experimental use. You did not object to summary judgment in anywhere I could see ever using the words experimental use. That's correct. Let me turn quickly to the non-infringement. Mr. Lemley said that West cross-moved for summary judgment and cited a 2957. That's entitled West's Interactive's Opposition to Motion for Summary Adjudication. There is no cross-motion for summary judgment, so Phoenix couldn't have waived the issue that I raised on non-infringement. There was, West did not sustain, turning to invalidity, West did not sustain its burden of proof of showing that a limited grammar is downloaded for the speech recognition engine based on context. That's required by the second limitation of Claims 1 and 9 of the 431 patent, regardless of whether the definition of when in that limitation means before, during, or shortly after, there was an utter lack of evidence that a limited grammar was ever downloaded at any time for the speech recognition engine, as opposed to the natural language processor. And that's what is required for that second limitation. And even more, moreover, the meaning of when still doesn't matter if you read that limitation as applying to when the grammar is downloaded, as opposed to when the user is speaking. In the specification, the reference that West relies on at page 42 of its red brief is referring to the decoding of the speech utterance, not to the downloading of the limited processor. And finally, the district court did not provide any analysis, and CHMAT did not provide any analysis with respect to the 854 Claims 8, 9, 12, and 13. And specifically with respect to Claim 9, that's a claim that required that the speech recognition be distributed across two platforms. The only evidence in the record is that Galaxy was accessed by a telephone. And there is no evidence in the record whatsoever that the telephone had any part of the speech recognition search engine whatsoever. It was only a telephone. Thank you, Mr. Hadley.